UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY FOX, ET AL., | No. 2:11-cv-0419 JAM AC |
| Plaintiffs, | |
| v. | FINDINGS & RECOMMENDATIONS |
| JASMINE DELGADO, ET AL., | |
| Defendants. | |

On October 2, 2013, the court held a hearing on plaintiffs' August 5, 2013 amended and renewed motion for default judgment. Lanny T. Winberry appeared for plaintiffs. No appearances were made for defaulting defendant Jasmine Delgado. A status conference was thereafter held on November 6, 2013, and an evidentiary hearing regarding damages was held on December 18, 2013. Defendant Delgado was notified of the status conference and evidentiary hearing, and failed to appear. On review of the motion, the documents filed in support, upon hearing the argument of counsel and considering the evidence presented, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

## RELEVANT FACTUAL BACKGROUND

Shortly after 9:00 a.m. on the morning of January 29, 2010, plaintiff-mother Nancy Fox ("Nancy") dropped her 2.5 year old son, M.F., at defendant-babysitter Nancy Delgado's ("Delgado") apartment for babysitting. ECF No. 14, First Am. Compl. ("FAC") ¶¶ 26-29. At the

1

1    time he was dropped off, M.F. was still in his "footy" pajamas, though Nancy also provided
2    clothes for the day, including socks and a pair of tennis shoes.  Id. ¶ 29.  Nancy left Delgado's
3    residence at 9:15 a.m. while M.F. was "peaceful and contented."  Id. ¶ 30.
4         On arrival at Delgado's apartment, M.F. went to Delgado's bedroom where he, Delgado,
5    and Delgado's son watched videos for approximately an hour before Delgado changed M.F.'s
6    diaper.  FAC ¶ 30.  M.F. then played with Delgado's son for another hour before Delgado
7    changed M.F.'s diaper again.  Id.  During this entire time, M.F.'s "footy" pajamas remained on.
8    Id.  Delgado eventually changed M.F. into his pants, socks and shoes around noon that day.  Id.;
9    see also id. ¶ 120.
10        In the early afternoon on January 29, 2010, Delgado called Nancy, urging her to pick M.F.
11   as soon as possible at Delgado's mother's apartment, which was a first-floor apartment in the
12   same complex as Delgado's second-floor apartment.  FAC ¶ 31.  When Nancy arrived at
13   Delgado's mother's apartment, she saw M.F. lying on a living room sofa with his pants on but
14   without shoes or socks.  Id. ¶ 32.  M.F.'s feet were pink to red in color and appeared to have large
15   water blisters and detached skin on their tops.  Id.
16        Delgado noted to Nancy that six weeks before, M.F. had a similar blister and redness on
17   his upper thumb, which Delgado had "lanced" and from which she had expressed clear liquid.
18   FAC ¶ 33.  On that occasion, Nancy took M.F. directly to a clinic called The Doctors Center
19   Medical Group, Inc. ("The Doctors Center") in Fair Oaks, California.  Id.  At the time, Nancy
20   believed the redness and blistering on M.F.'s hand was a bacterial infection secondary to an insect
21   or spider bite.  Id.
22        Delgado told Nancy that the redness, blistering and detached skin on M.F.'s feet must
23   have been caused by a bacterial infection, similar to the one previously seen on M.F.'s thumb.
24   FAC ¶ 34.  Delgado said the bacteria must have been present in the shoes because "M.F. was fine
25   before I put his shoes on him."  Id.
26        Nancy immediately took M.F. to The Doctors Center.  FAC ¶ 36.  Delgado accompanied
27   Nancy, comforting M.F. in the car as Nancy drove.  Id. ¶ 37.  While traveling there, Delgado
28   repeated that M.F. was fine until after his shoes were put on him and that he only began to cry

1  and complain of pain when he began to play with a little girl near the foot of the stairs.  Id. ¶ 38.

2  At The Doctors Center, the attending physician diagnosed M.F. with immersion burns and
3  directed Nancy to take him to the Shriners Burn Center Hospital in Sacramento ("Shriners").
4  FAC ¶ 39.  At Shriners, it was deemed that M.F.'s injuries were caused by his feet being
5  immersed in scalding hot liquid and that such burns would have occurred within 15-20 minutes of
6  immersion.  Id. ¶¶ 43, 55.  Delgado stated that she had no knowledge of any burning incident of
7  any kind while M.F. was in her care that day.  Id. ¶ 43.

PROCEDURAL BACKGROUND

A.  General Background

Plaintiffs initiated this action on February 14, 2011 and are proceeding on a first amended complaint ("FAC") filed May 2, 2011.  In the FAC, plaintiffs named as defendants the City of Rancho Cordova ("City"), the County of Sacramento ("County"), three deputy sheriffs employed by the County ("the police defendants"), four employees of Child Protective Services ("the CPS defendants"), and Jasmine Delgado.  Plaintiffs Barry and Narcisa Fox ("the parent plaintiffs"), appearing individually and as parents and natural guardians and guardians ad litem of their four minor sons (A.F., D.F., S.F., and M.F.), accused the City, the County, the police defendants, and the CPS defendants of failing to conduct an adequate investigation into the cause of blisters found on the feet of their youngest son, M.F., while in the care of his babysitter, Delgado.  Having failed to properly investigate the matter, plaintiffs claimed that these defendants baselessly accused Barry and Narcisa Fox of physically abusing M.F. and, accordingly, removing all four children from the care and custody of the parent plaintiffs for nearly two months, in violation of state and federal law.  Plaintiffs brings suit against Delgado for negligence.

On January 22, 2013, plaintiffs filed a notice of dismissal by stipulation as to the City, the County, the police defendants, and the CPS defendants following settlement of all claims as to them.  See ECF Nos. 74, 76, 83.  Only defendant Delgado remains in this action.

In their Eighth Claim for Relief in the FAC directed solely to Delgado, plaintiffs claim that M.F. suffered bodily injuries while in the care, custody, and control of Delgado and that the injuries so suffered are such that they do not normally occur in the absence of negligence on the

3

part of the person providing such care, custody, and control. FAC ¶¶ 149-52. Plaintiffs claim that, as a result of Delgado's negligence, M.F. has been damaged in the "form of extreme pain and suffering, permanent injury and disfigurement to his feet and the donor skin graft site on his back and psychic injury in a degree to be ascertained and determined from the evidence received at trial and in the need for future medical care." Id. ¶ 151. The FAC seeks damages not less than $200,000.00.

B.    Delgado's Appearances

On March 1, 2011, Delgado was personally served with the summons and complaint. ECF No. 10. On March 14, 2011, Delgado appeared in this action by filing a one-paragraph letter in which she acknowledged receipt of the complaint, expressed her confusion as to what was required of her with regard to this litigation, implied that she would need a Spanish interpreter, and provided her phone number for future contact. ECF No. 5.

On May 2, 2011, Delgado was served by mail with the FAC. ECF No. 14, Ex. 1. Delgado did not file a response to the amended complaint. She did, however, appear for a deposition on February 28, 2012 pursuant to a Notice of Deposition served on her on February 6, 2012. Pls.' Req. Entry of Default J., Winberry Decl. ¶ 4, ECF No. 66-2.

On September 18, 2012, plaintiffs filed a Request for Entry of Default against Delgado ECF No. 66. On September 20, 2012, the Clerk of the Court entered default against Delgado. ECF No. 67.

Now pending is plaintiffs' renewed motion for default judgment against Delgado on plaintiffs' eighth claim for negligence. Plaintiffs' first motion for default judgment was denied without prejudice due to numerous shortcomings in the motion. See ECF No. 84.

DISCUSSION

A.    Default Judgment

Under Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment where the clerk, under Rule 55(a), has already entered the party's default based upon a failure to plead or otherwise defend the action. The district court's decision to enter a default judgment involves some discretion. Lau Ah Yew v. Dulles, 236 F.2d 415 (9th Cir. 1956) (affirming district

4

court's denial of default judgment). The court is free to consider a wide range of factors in deciding whether to enter a default judgment, including: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986); see also Wright & Miller, Fed. Practice and Procedure, Civil § 2685.

### 1. Factor One: Possibility of Prejudice to Plaintiff

The first factor set forth by the Ninth Circuit in Eitel considers whether the plaintiff would suffer prejudice if default judgment is not entered, and whether such potential prejudice to the plaintiff militates in favor of granting a default judgment. See PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Here, plaintiffs would potentially face prejudice if the court did not enter a default judgment. Absent entry of a default judgment, plaintiffs would be without recourse for recovery. Accordingly, the first Eitel factor favors the entry of default judgment.

### 2. Factors Two and Three: The Merits of Plaintiff's Substantive Claims and the Sufficiency of the Complaint

The undersigned considers the merits of plaintiffs' substantive claims and the sufficiency of the FAC together below because of the relatedness of the two inquiries. The undersigned must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought. See Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978); PepsiCo, Inc., 238 F. Supp. 2d at 1175.

Upon default, the general rule of law is that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (quoting Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977)). Under this standard, the well-pled allegations in the complaint regarding liability are deemed true, but the plaintiff must establish the relief to which she is

1  entitled. Fair Hous. of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002). Furthermore,
2  "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not
3  established by default." Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992)
4  (citing Danning, 572 F.2d at 1388).

5      In the FAC, plaintiffs claim that, on the morning of January 29, 2010, Nancy dropped off
6  2.5 year old M.F., still in his "footy" pajamas and without injury, at Delgado's second-floor
7  apartment for babysitting services. M.F. remained in his "footy" pajamas while watching T.V.
8  and playing with Delgado's son until approximately noon when Delgado put M.F.'s pants, socks,
9  and shoes on him. M.F. then went downstairs to play with a neighbor's daughter before he
10 started to cry and complain in pain. In the early afternoon, Nancy received a telephone call from
11 Delgado telling her that something was wrong with M.F.'s feet and that Nancy should come pick
12 him up as soon as possible. When Nancy arrived, she saw that M.F. had his pants on but no shoes
13 or socks. When she examined M.F.'s feet, Nancy noticed that they were pink to red in color and
14 appeared to have large water blisters and detached skin on their tops. Delgado told Nancy "M.F.
15 was fine before I put his shoes on him." Nancy, along with Delgado, took M.F. to The Doctors
16 Center, where the attending physician diagnosed M.F. with second degree immersion burns.
17 Nancy then took M.F. to Shriners, where he was treated for immersion burns, and where the
18 treating physician said that such burns appear within 15-20 minutes of immersion.

19     Plaintiffs bring suit against Delgado for negligence. "The elements of a cause of action
20 for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3)
21 proximate [or legal] cause between the breach and (4) the plaintiff's injury." Mendoza v. City of
22 Los Angeles, 66 Cal. App. 4th 1333, 1339 (1998) (citation omitted).

23     At the outset, the first and fourth elements of this cause of action are satisfied. First,
24 "[t]he existence of a legal duty to use reasonable care in a particular factual situation is a question
25 of law for the court to decide," Vasquez v. Residential Investments, Inc., 118 Cal. App. 4th 269,
26 278 (2004) (citation omitted), and the courts have repeatedly declared the existence of a duty
27 between a babysitter and a child in his or her care, custody, or control. See Joseph v. Johnson,
28 178 Cal. App. 4th 1404, 1410-12 (2009); Quigley v. First Church of Christ, Scientist, 65 Cal.

App. 4th 1027, 1041-42 (1998); People v. Moreno, 2 Cal. App. 4th 577, 584 (1992). Moreover, there is no dispute that M.F. suffered extensive injury to his feet, resulting in the need for, inter alia, skin grafts.

Plaintiffs rely on a theory of res ipsa loquitur to establish proximate cause. This doctrine provides that "certain kinds of accidents are so likely to have been caused by the defendant's negligence that one may fairly say 'the thing speaks for itself.' . . . In California, the doctrine of res ipsa loquitur is defined by statute as 'a presumption affecting the burden of producing evidence.' Cal. Evid. Code § 646, subd. (b). The presumption arises when the evidence satisfies three conditions: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." Brown v. Poway Unified Sch. Dist., 4 Cal. 4th 820, 825-26 (1993) (internal quotation omitted). "[R]es ipsa loquitur authorizes an inference of negligence in the absence of a showing to the contrary." Roddiscraft, Inc. v. Skelton Logging Co., 212 Cal. App. 2d 784, 793 (1963).

Ordinarily, a default itself establishes the defendant's liability. Schwarzer, Tashima, and Wagstaffe, Fed. Civ. Proc. Before Trial § 6:92 (West 2013). Furthermore, if proximate cause is properly alleged in the complaint, it is admitted by default. Id. § 6:92.1. Despite the admissions upon default, the court retains the power to require additional proof of any fact alleged as the basis for liability. Id. § 6.93.

Here plaintiffs contend, under the doctrine of res ipsa loquitur, that M.F.'s immersion burn must have occurred while M.F. was in Delgado's custody, care, and control, as evidenced by the following facts: (a) M.F.'s feet were not injured prior to his arrival at Delgado's apartment, (b) M.F. spent more than two hours in his "footy" pajamas without complaint, (c) Delgado did not notice any injury to M.F.'s feet when she put his pants, socks, and shoes on around noon, (e) M.F. began to cry soon after his socks and shoes were placed on his feet, and (f) blisters following an

7

immersion burn appear within 15-20 minutes of contact with a hot liquid.[1]

Since an immersion burn is a type of injury which ordinarily does not occur in the absence of someone's negligence, and since such a burn occurred while M.F. was in the care and custody of Delgado, and finally, since M.F. was incapable, as a matter of law, of being contributively negligent, see Fowler v. Seaton, 61 Cal. 2d 681, 687 (1964), the court finds these allegations sufficient under California law to establish negligence under a theory of res ipsa loquitur.

3.  Factor Four: The Sum of Money at Stake in the Action

Under the fourth factor cited in Eitel, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." PepsiCo, Inc., 238 F. Supp. 2d at 1177. Plaintiffs here seek no less than $200,000.00 in damages and as much as $1,000,000.00. For the reasons discussed below regarding damages, the undersigned finds that plaintiff is limited as a matter of law to the $200,000.00 specified in the FAC. Therefore, this factor does not weigh against entry of default judgment.

4.  Factor Five: The Possibility of a Dispute Concerning Material Facts

The court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists. See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F. Supp. 2d at 1177.

The facts of this case are relatively straightforward, and plaintiffs have provided the court with well-pleaded allegations supporting their claims. Under the doctrine of res ipsa loquitor, a

---

[1] Although plaintiff uses the phrase "immersion burn," plaintiff does not know how the contact with scalding water occurred. The label "immersion burn" does not limit plaintiff to a theory that the burns were caused by forcible submersion of bare feet in a standing body of water. Given the fact that M.F.'s burns were discovered upon removal of wet socks and sneakers, it may be inferred that scalding water was poured or spilled onto M.F's feet and into his sneakers while he was wearing the shoes. Such an occurrence would have surrounded M.F.'s feet with scalding water inside his shoes, resulting in "immersion" type burns and causing the soaked sneakers.

presumption is created to support a finding of proximate causation.  Cal. Evid. Code § 646, subd. (b); Roddiscraft, 212 Cal. App. 2d at 793.  However, Delgado's testimony at her February 28, 2012 deposition demonstrates an attempt to rebut the theory that she must have been negligent.  See Pls.' Mot. Def. J., Ex. A, ECF No. 86-2 at 6-46.  In order to rebut the res ipsa loquitur presumption affecting the burden of producing evidence, a defendant need only introduce evidence sufficient to "support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence, . . . ."  Cal. Evid. Code, s 646, subd. (c); Frantz v. San Luis Medical Clinic, 81 Cal. App. 3d 34, 42-43 (1978).  This burden is "far less than the burden of proof imposed upon the opponent of a presumption that is classified as a presumption that affects the burden of proof."  Frantz, 81 Cal. App. 3d at 42.

      At her February 28, 2012 deposition, Delgado testified that when M.F. was dropped off in the morning, he was still in his full-body pajamas.  Pls.' Mot. Def. J., Ex. A, ECF No. 86-2 at 11.  Twice that morning, Delgado changed M.F.'s diaper, but she did not notice any blisters on M.F.'s feet, and she stated that M.F. did not complain of pain at either time.  Id. 11-12.  She did state though that when she was putting M.F.'s socks and shoes on around noon, she noticed that his feet were swollen and hot.  Id. 13.  After the socks and shoes were put on, the two went downstairs where Delgado stopped to talk to a neighbor for approximately five minutes.  Id. 15.  M.F. stayed near Delgado this entire time.  Id.  When the neighbor's young daughter pulled M.F.'s hand to go play, M.F. started crying.[2]  Id. 15-17.  Delgado lifted M.F. and took him to her mother's apartment, which was on the first floor below Delgado's second-floor apartment.  Id. 17.  At some point, Delgado noticed that M.F.'s socks were wet up to the top of the shoes.  Id. 18.  When she removed the socks and shoes, she noticed that the socks were warm to the touch and that M.F.'s feet had "a lot of . . . little water bubbles."  Id. 21.  She later noticed these same bubbles (or blisters) on or near M.F.'s knee.  Id. 19, 22.  Delgado attributed the sudden occurrence of the bubbles to "something contagious" in the shoes, which she promptly threw in the trash.  Id. 21.

---

[2] Delgado later testified that M.F. did not cry until his mother came to pick him up ("[W]hen he was with me, he wasn't crying").  Pls.' Mot. Def. J., Ex. A, ECF No. 86-2 at 18.

Delgado asserted that the blisters on M.F.'s feet must have been caused by an infection related to his shoes, since M.F. was never out of Delgado's sight and she did not witness any contact with scalding liquid. Delgado did not explain, however, how or why M.F.'s socks were wet and warm to the touch and further failed to explain why M.F. had blisters on or near his knee. The contaminated shoe theory also contradicts the medical evidence that M.F. suffered immersion burns 15-20 minutes before the appearance of the blisters. Delgado's deposition testimony therefore fails to meet the low standard of evidence "sufficient to sustain a finding of the nonexistence of the presumed fact." Slater v. Kehoe, 28 Cal. App. 3d 819, 833 (1974). See also Fowler, 61 Cal. 2d at 688-89. Accordingly, this factor weighs in favor of default judgment for plaintiffs.

     5.     Factor Six: Whether the Default Was Due to Excusable Neglect

Upon review of the record before the court, the undersigned finds that the default was not the result of excusable neglect. See PepsiCo, Inc., 238 F. Supp. 2d at 1177. Plaintiffs were in compliance with the Federal Rules of Civil Procedure, nearly two years have passed since this suit was initiated, and although made an attempt to appear in this action, her participation ended following her February 2012 deposition. Moreover, plaintiffs served Delgado by mail with notice of their renewed motion for default judgment. Despite ample notice of this lawsuit and plaintiffs' intention to seek a default judgment, Delgado has not appeared in this action to date. Thus, the record suggests that Delgado has chosen not to defend this action, and not that the default resulted from any excusable neglect. Accordingly, this Eitel factor favors the entry of a default judgment.

     6.     Factor Seven: The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible." Eitel, 782 F.2d at 1472. However, district courts have concluded with regularity that this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action. PepsiCo, Inc., 238 F. Supp. 2d at 1177; see also Craigslist, Inc. v. Naturemarket, Inc., 2010 WL 807446, at *16 (N.D. Cal. Mar. 5, 2010); ACS Recovery Servs., Inc. v. Kaplan, 2010 WL 144816, at *7 (N.D. Cal. Jan. 11, 2010) (unpublished); Hartung v. J.D. Byrider, Inc., 2009 WL

1876690, at *5 (E.D. Cal. June 26, 2009) (unpublished).  Accordingly, although the undersigned is cognizant of the policy in favor of decisions on the merits—and consistent with existing policy would prefer that this case be resolved on the merits—that policy does not, by itself, preclude the entry of default judgment.

### 7. Conclusion Regarding Propriety Of Default Judgment

For the reasons explained above, consideration of the Eitel factors and California negligence law support the entry of default judgment against defendant Delgado.  The court now turns its attention to the relief sought by plaintiffs.

## B. Relief Sought

### 1. Plaintiffs Are Limited To The Damages Pleaded In The First Amended Complaint

Rule 54(c) of the Federal Rules of Civil Procedure provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).  Comparison of plaintiffs' FAC with the renewed motion for default judgment reveals critical differences that affect the plaintiffs' recovery on default.  In the FAC, plaintiffs seek damages "in an amount not less than $200,000.00."  FAC ¶ 152.  But in the renewed motion for default judgment, plaintiffs seek damages "in an amount not less than one million dollars."  Pls.' Renewed Mot. Entry Def. J. at 14.  Moreover, the FAC seeks recovery only for M.F.'s (1) pain and suffering, (2) permanent injury and disfigurement to his feet and the donor skin graft on his back, (3) psychic injury; and (4) future medical care.  FAC 43.  But in the renewed motion for default judgment, plaintiffs seek damages for M.F.'s pain and suffering and for *past* medical expenses for services rendered.  Plaintiffs do not seek damages for *future* medical care needs.

In United States v. Fong, 300 F.2d 400 (9th Cir. 1962), the Ninth Circuit considered the district court's judgment for damages in excess of the amount pled in the complaint after the defendant's answer was stricken pursuant to Rule 37 and default judgment was entered due to defendant's consistent failure to appear at his deposition.  Id. at 404-06.  The court recognized that one Eighth Circuit case had determined that when "'the defendant appears at the hearing on the application for [default] judgment, the court, in the exercise of sound discretion, may permit the claimant to amend his prayer for relief.'"  Id. at 412 (citing Peitzman v. City of Illmo, 141

11

1  F.2d 956, 962 (8th Cir. 1944)).

2  The Ninth Circuit disagreed with the Eighth Circuit's holding, and instead determined that "the mandate of the Rule [54(c)] is very simple, clear and decisive that a judgment 'shall not be different in kind from or exceed in amount that prayed for in the demand for judgment' in default cases." Id. at 413.  The court found that it was "unable to escape the explicit and emphatic mandate of Rule 54(c)" and thus limited the default judgment against the defendant to the amount pled in the plaintiff's complaint.  Id.; see also Landstar Ranger, Inc. v. Parth Enters., Inc., 725 F. Supp. 2d 916, 923 (C.D. Cal. 2010) (Rule 54(c) allows "only the amount prayed for in the complaint to be awarded to the plaintiff in a default."); Cent. Fla. Council, Boy Scouts of Am., Inc. v. Rasmussen, 2010 WL 1258070, at *10 (M.D. Fla. Mar. 29, 2010) ("[T]he Court will apply Rule 54(c) as it is written."); Albert v. Wesley Health Servs., 2001 WL 503241, at *1 (D. Kan. May 10, 2001) ("[P]laintiff's damages are limited to the amount which she demanded in her prayer for relief."); but see Stafford v. Jankowski, 338 F. Supp. 2d 1225, 1228-29 (Kan. 2004).

Here, plaintiffs seek default judgment for Delgado's failure to appear in this action.  As noted, the Ninth Circuit has stated that damages pursuant to default judgment are limited under Rule 54(c) to the amount pled in the complaint.  Fong, 300 F.2d at 413.  The Ninth Circuit has also held that a default judgment that goes "beyond the scope of the complaint" is a "nullity." Pueblo Trading Co. v. El Camino Irrigation Dist., 169 F.2d 312, 313 (9th Cir. 1948); see also Ioane v. Alter, 1997 WL 767526, at *3 (N.D. Cal. Nov. 21, 1997) ("Any default judgment is limited to the claims asserted and the relief demanded in the pleadings served on the defendants.")  Therefore, the court is bound by plaintiffs' pleadings, and plaintiffs may only recover for M.F.'s (1) pain and suffering, (2) permanent injury and disfigurement to his feet and the donor skin graft on his back, (3) psychic injury; and (4) future medical care.

In addition to the foregoing, the court notes that the FAC seeks damages "in an amount not less than $200,000.00." FAC ¶ 152.  Plaintiffs claim that this entitles them to, at a minimum, $200,000.00, and they therefore seek a maximum recovery of $1,000,000.00.  "But such general allegations will *not* support a default judgment for a greater, unlimited amount. 'Fundamental fairness' limits plaintiff to the greatest amount specifically alleged in the complaint." Schwarzer,

12

Tashima, and Wagstaffe, Fed. Civ. Proc. Before Trial § 6:132 (West 2013) (emphasis in original). Thus, plaintiffs' damages may not exceed $200,000.00.

        2.      <u>Plaintiffs May Not Recover Economic Damages Pursuant To The Collateral Source Rule</u>

In their motion for default judgment, plaintiffs seek compensation for the cost of medical care provided at Shriners. Though plaintiffs acknowledge that they did not pay any medical bills, as Shriners Hospital is a charitable institution that does not charge for its services, they rely on <u>Howell v. Hamilton Meats & Provisions, Inc.</u>, 52 Cal. 4th 541, 548 (2011), to argue that such fees can be included in a damages award pursuant to California's collateral source rule. Plaintiffs accordingly sought to present testimony as to the commercial value of the services rendered by Shriners. At the November 6, 2013 status conference, the undersigned ruled for the reasons now explained that such evidence would not be admitted at the evidentiary hearing on damages.

Under California's collateral source rule, a plaintiff's damage award may not be reduced to account for compensation the plaintiff received from sources independent of the tortfeasor as to amounts the plaintiff "would otherwise collect from the tortfeasor." <u>Howell</u>, 52 Cal. 4th at 548. The comments to the Restatement (Second) of Torts § 920A provide that,

> [i]f the benefit was a gift to the plaintiff from a third party . . . , he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.

Restatement (Second) of Torts § 920A cmt. b (1979). Following this principle, a California plaintiff's compensation may not be reduced by amounts paid to a medical provider by a third party including an insurance company, government program, or private benefactor. See <u>Howell</u>, 52 Cal. 4th at 548 (insurance payments); <u>Luttrell v. Island Pacific Supermarkets, Inc.</u>, 215 Cal. App. 4th 196, 205-08 (2013) (Medicare); <u>Sanchez v. Brooke</u>, 204 Cal. 4th 126, 140-43 (2012) (worker's compensation).

Application of the rule is limited, however, to liabilities actually incurred by the plaintiff in the first instance that are then satisfied by a third party. As the California Supreme Court

13

explained in Howell itself:

> The rule . . . has no bearing on amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment. Such sums are not damages the plaintiff would otherwise have collected from the defendant. They are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses. Because they do not represent an economic loss for the plaintiff, they are not recoverable in the first instance. The collateral source rule precludes certain deductions against otherwise recoverable damages, but does not expand the scope of economic damages to include expenses the plaintiff never incurred.

52 Cal. 4th at 548-49.  Accordingly, the court ruled that recovery for medical costs paid by insurance is limited to the amount accepted by the medical provider from the insurance company as payment in full, even where that amount is less than the amount stated in the provider's bill. Id. at 548, 567.  This result necessarily follows from the fact that plaintiff never incurred an actual liability in the larger amount.  Id. at 548, 553.

In the context of medical services that are provided on a gratuitous basis, these principles compel the following rule:  "Where a medical provider has (1) rendered medical services to a plaintiff, (2) issued a bill for those services, and (3) subsequently written off a portion of the bill gratuitously, the amount written off constitutes a benefit that may be recovered by the plaintiff under the collateral source rule." Sanchez v. Strickland, 200 Cal. App. 4th 758, 769 (2011). Plaintiffs here do not come within the scope of the collateral source rule as it applies to gratuitous services.  Plaintiffs do not claim that they ever incurred any expenses for the services rendered at Shriners, and counsel for plaintiffs stated at oral argument that plaintiffs were never billed for Shriners services.  Shriners did not write off all or part of a bill that plaintiffs were otherwise obligated to pay; its policy is not to charge patients at all.  In short, plaintiffs never suffered any compensable loss to which the collateral source doctrine might apply.  See Howell, 52 Cal. 4th at 548.  Accordingly, they may not recover for past medical expenses.

     3.     <u>Assessment of Non-Economic Damages</u>

Federal Rule of Civil Procedure 55(b)(2)(B) authorizes a district court to hold an evidentiary hearing to determine the amount of damages on default judgment.  See Rodriguez v.

1  Wallia, 2012 U.S. Dist. LEXIS 74281 (N.D. Cal. Apr. 18, 2012) ("Rule 55(b)(2) allows, but does
2  not require, the court to conduct a hearing on damages, as long as it ensures that there is an
3  evidentiary basis for the damages awarded in the default judgment.") (quoting Action S.A. v.
4  Marc Rich & Co. Inc., 951 F.2d 504, 508 (2d Cir. 1991)); Holtsinger v. Briddle, 2007 U.S.
5  LEXIS 30164, at *4 (E.D. Cal. 2007) ("[W]hen a plaintiff's damages are unliquidated (i.e.,
6  [in]capable of ascertainment from definite figures contained in documentary evidence or in
7  detailed affidavits) or punitive, they require 'proving up' through an evidentiary hearing or some
8  other means.") (citation omitted)).  The court may rely on affidavits and documentary evidence as
9  well as witness testimony.  Fustok v. ContiCommodity Services, Inc., 873 F.2d 38, 40 (2d Cir.
10 1989); see also Pope v. United States, 323 U.S. 1, 12 (1944) ("It is a familiar practice and an
11 exercise of judicial power for a court upon default, by taking evidence when necessary or by
12 computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to
13 recover and to give judgment accordingly.").
14      An evidentiary hearing on damages was held on December 18, 2010.  M.F.'s father, Barry
15 Fox, testified that he took the photographs contained in Exhibits 6 and 7.  M.F.'s mother, Narcissa
16 ("Nancy") Fox, testified about her observations of M.F. on the day of the injury and throughout
17 his hospitalization.  The following exhibits were entered into evidence:  (1) Certification of
18 Records of Shriners Hospital; (2) Shriners Hospital Record re Admission of M.F. (dated 1/29/10);
19 (3) Sheriff's photos showing condition of M.F.'s feet on 1/29/10; (4) Shriner's Hospital Record
20 describing skin graft procedure on M.F. (dated 2/5/10); (5) Shriner's Hospital Record showing
21 discharge of M.F. (dated 2/19/10); (6) Photos showing M.F.'s feet following skin graft procedure;
22 (7) Photos showing skin graft donor sites on M.F.'s back and left buttock, taken recently; (8)
23 Shriner's Records of Treatment Listing Pain medication administered to M.F. (dated 1/29/10
24 through 2/19/10); (9) The Doctors' Center Record of Treatment of M.F. listing pain medications
25 administered (dated 1/29/10); (10) Enlarged Sheriff's photo of M.F.'s left foot, taken 1/30/10.
26 The minor M.F. (presently six years old) was present in court, and the undersigned viewed his
27 back and feet (but not the graft site on M.F.'s buttocks, which is documented in Exhibit 7).  Based
28 on this evidence, the court finds the following facts:

a. <u>Pain and suffering incident to burns, treatment, and recovery</u>

When Nancy Fox arrived at the babysitter's on the day of the injury, M.F. was on the couch with his feet elevated and the skin visibly peeling off them. His face showed pain and fear, and he was crying. M.F. was taken first to The Doctors Center Medical Group, where a second degree burn of both feet was diagnosed, "total sloughing of the epidermis" was noted, and morphine was given by injection for pain. Exhibit 9. M.F. was referred to the Shriner's Hospital burn unit where he was admitted that day and stayed for 21 days. Exhibits 2-5, 8. The photographs taken at the hospital by a Sacramento Sheriff's Department photographer prior to the skin graft surgery show feet that appear to have been skinned below the ankle. The feet are dramatically red, raw and swollen. The edges of the burns, above the ankles, clearly show that the skin below has peeled off. Exhibit 2.

On intake at Shriner's, M.F. was diagnosed with bilateral burns to the feet, specifically "partial-thickness burns in a stocking-glove-like distribution with some splatter burns higher up." Exhibit 2. M.F. was given more morphine, and acetaminophen with codeine. Both medications were prescribed to continue as needed. Exhibit 8. Over the course of the next three weeks, M.F.'s pain was regularly treated with morphine and acetaminophen with codeine; he also received doses of midazolam (aka Versed) in relation to "painful procedures" on eight occasions.[3] On two occasions M.F. received diphenhydramine for anxiety or restlessness. Exhibit 8.

M.F. underwent surgery on February 5, 2010. He required excision and grafting of the burns on the tops of his feet and toes. The operative report states, "The patient had deep second to third degree burns on dorsal feet going onto the toes on the left and onto just the base of the toes on the right. He had otherwise healed burns on his left lateral leg and the soles of his feet had also healed, so he comes for grafting on the dorsal feet." Exhibit 4. Burned tissue was surgically removed from the tops of M.F.'s feet and toes, a large piece of skin was harvested from "a good majority of his back," and the healthy skin was grafted onto the excision site(s). Two

---

[3] Midazolam is used to produce sleepiness or drowsiness and to relieve anxiety prior to surgery or certain procedures. It is also used to induce loss of consciousness and/or memory of pain before and during surgery. See http://www.mayoclinic.com/health/drug-information/DR600929.

16

separate grafts were required on the right foot because the surgical team "ran out of skin and had to take a little bit from the left buttock region." Id. M.F. remained in the hospital for two weeks following the surgery, treated with antibiotics and pain medication. Exhibit 8.

While in the hospital, M.F. acted afraid of medical personnel and would cry when approached by a doctor or nurse for treatment of his burns (cleaning, changing of dressings, etc.), exclaiming "Don't let them hurt me."

M.F. was discharged on February 19, 2010, with a prescription for acetaminophen with codeine to treat continuing pain or discomfort.[4]

The undersigned concludes from these facts that M.F. experienced excruciating pain on the day of and in the immediate aftermath of his burns, and continued to experience significant pain in relation to the skin graft procedure and throughout his recovery at Shriners Hospital.

b. Permanent injury and disfigurement to M.F.'s feet and back

As noted, the undersigned personally examined M.F.'s feet and back as well as reviewing photographic evidence. Both of M.F.'s feet are severely and obviously scarred. His feet and ankles are tri-toned, and the scar tissue covering the tops of his feet and surrounding his ankles is thick, shiny, and in places ridged and puckered. The toes are intact and normal in size and shape, although the top surfaces are severely scarred. There is marked thickening and distortion of the skin and/or scar tissue around the ankles. The boundary between the scar tissue and the uninjured skin above the ankles is noticeably raised, and the damaged and undamaged skin are of obviously different colors and textures, creating the appearance that M.F. is wearing low-rise socks of scar tissue. The scarring on M.F.'s feet would be obvious to even a casual observer. It is scarring that can reasonably be expected to draw unwanted attention and inquiries in settings (such as the beach, swimming pool or locker room) where bare feet are common. The scarring of M.F.'s feet constitutes a permanent and severe disfigurement.

---

[4] No evidence was presented regarding the persistence or severity of M.F.s pain after discharge from the hospital, how long it took for him to be able to walk again, etc. The witnesses at the evidentiary hearing, M.F's parents, did not have custody of M.F. in the months immediately after his discharge, as he was placed in foster care by Child Protective Services. As previously noted, plaintiffs' claims against the county regarding the removal of their children have been dismissed pursuant to settlement.

17

M.F.'s feet are fully functional and do not presently cause him pain.

The visible graft donor site on M.F.'s back comprises a large rectangle of slightly paler skin extending over most of his back. There is no scarring, and the surface of the skin is smooth and unremarkable. The border between the graft donor site and the surrounding skin identifiable only by the slight difference in skin tone. M.F.'s back is otherwise normal in appearance. The graft donor site on M.F.'s left buttock is identifiable in photographs as a round area of several inches diameter, of a skin tone slightly different from the surrounding skin. The graft donor sites are identifiable upon inspection but may not be obvious to a casual observer at first glance. Unlike the feet, they do not present gross disfigurement. They do, however, constitute a permanent physical alteration and mark of M.F.'s experience as a burn victim.

          c.        <u>Psychic injury</u>

According to the testimony of Nancy Fox, M.F. recoiled from contact with water in the hospital and to this day exhibits fear of water on his skin. For example, he sometimes covers his face with his hands at bath time. Because M.F. took swimming lessons last summer and there was no testimony that he feared entering the swimming pool, the court finds that M.F.'s fear of contact with water is not presently severe. The undersigned finds Ms. Fox's testimony credible regarding M.F.'s fear of contact with water in the weeks and months following his injuries. There is an insufficient evidentiary basis, however, to determine how long this fear lasted or to what extent if any it limited the normal activities of childhood including bathing and recreation.

Four years after sustaining the burns, M.F. sometimes has bad dreams. When asked about the dreams, he reports he is scared that someone will hurt him.

When asked by other children at swimming lessons last summer what happened to his feet, M.F. would reply "They got hurt," and quickly change the subject.

M.F. saw a psychologist about a year ago and again two or three weeks prior to the evidentiary hearing to assess his adjustment. No expert testimony was presented regarding his psychological well-being.

          d.        <u>Future medical/psychological care</u>

Plaintiffs do not anticipate future medical treatment for M.F.'s burns or graft donor sites.

Plaintiff did not present any expert testimony supporting a claim for damages for future psychological treatment, representing that it is "too soon to tell" whether the disfigurement of M.F.'s feet will prove to have long-term psychological consequences.

          e.      <u>Conclusion Regarding Amount Of Damages</u>

The undersigned concludes that M.F. experienced severe pain and suffering for at least three weeks (the duration of his hospitalization) as the result of his burns, as well as permanent disfigurement of his feet. Although it is reasonable to infer that M.F.'s experiences related to the burns were psychologically as well as physically traumatic, there is insufficient evidence to find lasting psychic injury and no evidence of present or future need for psychological treatment. M.F.'s proven pain, suffering and disfigurement support a damages award in the amount of $200,000.00, the maximum available under the First Amended Complaint.

For these reasons, IT IS HEREBY RECOMMENDED that:

1. Plaintiffs' August 5, 2013 motion for default judgment be granted in part;
2. Judgment be entered for plaintiffs on their eighth claim for relief against defendant Jasmine Delgado;
3. Judgment for plaintiffs be entered in the amount of $200,000.00.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 19, 2013

*/s/ Allison Claire*
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE